Good morning, Your Honor. Good morning, Russell Thomas, for the appellant. This is an appeal from the order of the district court which dismissed the claims in this case for retaliation, constructive discharge, and also the due process claim. The appellant in this case, Dr. Bailink, worked for the Department of Veterans Affairs at the Wilma Linda facility for many years, 40 years of service, and at the time that the events that gave rise to this lawsuit started, he was supervising approximately 100 other professionals in various large-scale research projects for the VA and for the Department of Defense. One of those projects that commenced in 2002, the study, although approved and administered at the Wilma Linda facility, all of the testing was done in Argentina, and this was part of a grant that was through the Department of Defense and VA to do a large-scale study in Argentina on bone marrow. In bone density, Dr. Bailink specializes in osteoporosis and studies that have to do with bone regeneration in order to deal with battlefield injuries and osteoporosis. The Argentina study proceeded, and in pursuant to a protocol which laid down the various procedures that were to be followed in implementing the studies, in May 2002, Dr. Bailink became aware of the fact that as the study proceeded, in Argentina, that children's samples were being taken. That was something that was not in the protocol. It was not part of the study. And when he became aware of that problem, he immediately reported it to the VA and to the Institutional Review Board, which is the group at the local VA that oversees research. And significantly for the outcome of this case, absolutely nothing was done about that report for several months. Later that same year, Dr. Jacobson became his supervisor and gave him a lower review than he had ever experienced in his 40 years with the VA. Was there any connection between that review and the concerns about the Argentine study? None. None. The Argentine study was not mentioned. His report was not mentioned. And then he, Jacobson, began to ask about his other colleagues, when would Dr. Bailink be retiring? And got the indication that he didn't, had no intention of retiring. Because of the low performance review and the mention of possible retirement, Dr. Bailink, in September of 2003, filed a charge with the local VA alleging age discrimination. I think, counsel, you're going to use up all your time going into the facts. We have the facts. Let me just help you focus your argument. We have two proceedings. One is the proceeding on the Argentine investigation that was done through the VA. As I understand, there's a review process that happened in Washington. Isn't that correct? Well, it was administered in Washington, but there were on-site visits. That's correct. All right. And that was independent of anything that was going on at Loma Linda. That was not triggered by Jacobson, correct? Yes, it was. You're getting to the heart of the case. That's what I'm trying to do. Yes. I'm sorry. If you could give me a heads up. You're approaching ten minutes right now, so you've used up almost five. I'd like to have a couple for rebuttal. Yes, I know. Then, suddenly, the study is questioned. Now, remember that the initial report of the children's samples was made 18 months earlier. So then, after the EEO report, and after the statement that Jacobson makes that how would you feel if you were doing a job, you were slapped with an EEO, the study then is questioned. And the ORO, the Office of Research Oversight, does a study and issues an interim report. And in the interest of time, let me then just focus on what I think the real problems are with the case. I'd like you to tell me how was Dr. Jacobson, how was he involved in initiating the investigation? Well, he reported all of a sudden his concerns with the study to the DA system, which then triggered the ORO investigation. He is the prime mover. Yeah. Judge Gould and I have a question relating to your prime mover comment. How do you square your theories on causal relationship and on constructive discharge with the opinion, which was one I wrote in the Poland case, P.O.L.A.N.D., which addresses the standard for when a action by an independent board can be attributed to a particular employee? Yes. There's that case and also a case that I didn't cite in my brief that is written by Judge Fletcher in OSTED v. Oregon Health Systems Science, which basically You could also talk about one I authored more recently called Lakeside Scott, which talks about, which puts a gloss on Judge Gould's fine opinion as well. All of those cases look to determine who was the real decision maker, not necessarily what it may appear to be, but who was the decision maker. You look at the excerpts of Record 322, Dr. Jacobson signed the letter putting them on administrative leave. That is the action that he took based upon the ORO report, a preliminary report, which is not even final, admitted in his deposition, it's in the record, that he didn't have to get anybody's approval for it, and he was the one, of course, that was the target of the initial EEO complaint made by Dr. Bailin. So that the whole process that led to all of these actions taken against Dr. Bailin was the result of Dr. Jacobson. He also admitted Well, I just need to understand, because I'm more familiar with Lakeside, because it's very current, and I just went through this process. And Lakeside, are you familiar with that case? I've read it, but I'm not going to be honest. All right. It was also a bench trial. It was a jury trial in that case. It was a JNOV. So this is a bench trial, so we're dealing with evidence that was adjudicated. And then the question is, what are the standards for imputing subordinate liability upstream? And what the opinion went at great lengths to inquire into on the evidence was the role of the subordinate, in this case, Jacobson, in initiating the inquiry, and then the role that the person in Jacobson's position played in the investigation, so that one could say that there was not an independent determination of discipline. And that's why the citus of the investigation of this ORO investigation is important, at least in understanding how it fits against the framework set up in Lakeside. Jacobson, as I mentioned, was the one that put him on administrative leave. The ORO, this is one of the, if I had more time, more detail, but one of the problems with the district court opinion is that the district judge misquotes the ORO in the AIV report, which we talked about in the brief. She quotes what she says is the ORO report and actually quotes the AIV report. The ORO, as Dr. Smith conceded at trial, has no authority to recommend any form of disciplinary action. All they do is comment on the research. Any disciplinary action is left with the agency. And as we quoted in the brief, in the record, Dr. Jacobson convened the AIV, the Administrative Investigation Board, expressly for the purpose of being able to develop evidence that he could use then to discipline and discharge Dr. Bailey. That is, we would challenge that on due process grounds, and I don't think I'm going to have time to discuss that. But when, and there's a, the dates get a little confusing in the appellee's brief, because the final ORO report came out in May of 05. Jacobson does nothing. When the AIV report comes out in July, it didn't recommend disciplinary action. So the only thing then left to do was to transfer Dr. Bailey to a job that was a, basically something that a first-year doctor could do. And on the administrative leave, I want to mention also that Dr. Bailey was put on leave in the sense that he was told to stay home, even though here we have this huge hospital, and he had been approved for clinical and medical duties, which he could have done. But Jacobson, in his zest to get him out of research and out of the hospital altogether, essentially basically told him to stay home. The other problem with the lower court decision is that Burlington and Judge Fletcher's opinion in Ray v. Henderson was not even recognized as the proper legal standard. We don't talk about McDonnell Douglas in these cases. The Supreme Court has made it clear, and this Court has made it clear even earlier, that the retaliation obligation is far broader than the protection against discrimination. And what you're looking at is whether the conduct would have the tendency to dissuade other employees from challenging EEO decisions. And when anyone at the VA would look to see what happened to Baylink after he challenged Jacobson's decision, it's absolutely clear that that conduct is the very conduct that we're talking about in Burlington and talking about in Ray v. Henderson, which would deter or dissuade other employees from challenging similar decisions. You're down to two minutes. You may want to start. I'll reserve if I may, Your Honor. You may. Good morning. Good morning. May it please the Court, why don't you let your opposing counsel take a seat first. All right, fine. Good morning, Your Honor. May it please the Court, my name is Jonathan Klink. And I represent Apelli Department of Veteran Affairs. And before I begin, I need to address an evidentiary issue, and that is all the evidence produced at trial shows that what began the ORO investigation was Dr. Baylink's report to the Institutional Review Board's research officer, Dr. Farley. Dr. Farley then, some months later, reported to the Washington office and to the higher levels of VA Loma Linda that serious research violations had taken place. How many months was that between the time that Dr. Baylink pointed this out? Yes, Your Honor. Your Honor, the report by Dr. Farley was in or to Dr. Farley by Dr. Baylink was in May of 2002. And Dr. Farley made the report to the higher ups in November of 2003. That's quite a long time. That's quite a long time. And Dr. Farley was deposed. His deposition was lodged with the court. And we can tell by the absence of any reliance on that deposition by Dr. Baylink that there was no connection between Dr. Farley's actions or inactions and Dr. Jacobson. And Dr. Jacobson is found by the trial court after hearing all the evidence. Not only was there no proof of pretext by the stated reasons by the VA, but also the court made the affirmative finding, and this is on page 10, lines 15 through 18, that plaintiff had failed his burden to prove retaliatory motive or bias against Dr. Jacobson himself. Then on top of that finding that there was no retaliatory motive by Dr. Jacobson, the court found there was no causation. When the court denied defendant's motion for summary judgment as to the retaliation claim, clearly when by reading the order it can tell, the court found the proximity and the temporal proximity of some concern and denied summary judgment. But after having heard all the evidence, the court found no bias and no causation. And based on the court's holding in Poland, that's fatal to a plaintiff's claim. Well, if in fact that's supported by the evidence, what role did Dr. Jacobson play in starting the investigation? None, Your Honor. The initial report of serious violations of the VA's research policy, and especially the human research policy, was made by Dr. Bailing himself. Then that report was made to Dr. Farley, which was then made to the chief of staff of VA Loma Linda, to the director, and then to the higher-ups in the region, for the entire Southern California region. And then reported to Washington, D.C., to the central office of the VA. And the central office determined to have an investigation by the ORO, the Office of Research Oversight. And Washington, D.C., selected the members who were completely unrelated to the VA. You're telling us that the VA was that dysfunctional, that it would take them about a year and a half to decide that something serious is going wrong? There can be other reasons than dysfunction, Your Honor. For example, the length of time between the ORO interim report and the ORO final report. Again, some months. But that was explained by Dr. Smith at trial as being caused by the fact that samples were taken in Argentina. And when the ORO was trying to prepare its final report, it had tried to get a contractor in Argentina to review all the records and make a report to the ORO. But due to Federal contracting regulation, it was unable to do so in a timely fashion and instead had to rely on the Argentine Institutional Review Board. And it's important for the Court to recall that these were serious violations of research policy. Children as young as six years old were tested. Well, so how did Farley explain why he sat on it for that long? Is that serious? My recollection, Your Honor, is he wasn't asked. He wasn't asked? Nobody asked him why he... That's correct, Your Honor. All right. But you're telling us that the district court found that there was no connection between Farley and Jacobson in the decision to forward the query on to the triggered ORO. No, Your Honor, because the entire issue of Dr. Farley didn't come up at trial, although his deposition was lodged. What the Court found was that Dr. Jacobson was not biased and no animus could be computed to the employer. Not that Jacobson wasn't involved in forwarding the concern, the triggered ORO. No, Your Honor. The Court didn't make such a finding because the evidence was in place that Dr. Bailink made the initial report. And these serious research violations... I'm still trying to understand. Bailink filed his... He alerted... He alerted the VA or he alerted the... I'm trying to figure out where the site is of the IRB. That was the Institutional Review Board at VA Loma Linda. Okay, and Bailink notified them. And they, in turn, as required by regulations, notified the chief of staff and the director. But they, in turn, notified the region and thus then a final report to Washington, D.C. And it was D.C. that created the ORO, made that decision. And Jacobson's contact with the pre-getting it to D.C. period, okay, what was his role in that? None. Didn't he write a letter at some point to Farley? I believe that was after Dr. Bailink made the report to Dr. Farley. And what was the content of that letter? I'm not familiar with it, Your Honor. Ann. I'd like to ask you about the nature of the discipline. They took him off of all research. But many people wrote and said that that was far too severe, that he ought to be allowed to continue with other research as long as it was not on human subjects. That's correct, Your Honor. Dr. Bailink did have a core of supporters who did write letters to the IRB on his support. But the IRB made the decision, after having reviewed the ORO interim report, that he should be suspended from all research for two years with the ability to reapply after that time. Because... They were the ones that determined the discipline, not Jacobson? They made the decision to suspend the research privileges. Yes, but all of them? Just that one decision, Your Honor. And then the decision to transfer him, since he could no longer work in research, the only available work for him was in clinical work. But it was their decision that he should not be involved in any kind of research. Yes, Your Honor. That was the Institutional Review Board. And what was Jacobson's connection with that decision-making process? As the assistant chief of staff for research, he is by regulation required to be a member of the Institutional Review Board, but a non-voting member. He was involved. He was present at the meetings, but... What's the evidence of what his role was? Are you familiar with the Lakeside decision? No, Your Honor. That doesn't help much. Even under Judge Gould's opinion in Poland, the question of subordinate liability is what their role is. Now, I realize Lakeside came out after the trial, but in terms of trying to sharpen the focus on the Poland inquiry, I'm trying to understand what the evidence was at trial about the role of the subordinate. That was clear from the Poland decision, and that's what the district court purported did apply, as I understand it. And the evidence at trial that was relied on by the trial court was that the inquiry was initiated by Dr. Bailing, and Dr. Jacobson had no influence whatsoever with the ORO inquiry. No, I understand ORO. Now it's coming back to Loma Linda, and it's the IRB, which is taking steps that result in the adverse employment decisions. And the question is, what was Jacobson's participation in that, whether he was a voting member or not? If he's in the room and he's got a bias and he wants to stick it to Dr. Bailing, he has the opportunity. Your Honor, what was adduced at trial was that, other than his non-voting membership, Dr. Jacobson did not have any influence on the decision of the IRB to suspend Dr. Bailing. Who testified about what went on in that decision-making process? The parties agreed to waive jury and have trial by narrative statements, and Dr. Bailing elected to submit his narrative statements. He did not request cross-examination of Dr. Jacobson, although he had the opportunity to do so. Dr. Jacobson's deposition was lodged with the Court, but no extract from that deposition has been germane to our proceedings. Any, but they didn't take the deposition of any other members of the, of that board? Yes, Your Honor, Dr. Farley. And Dr. Farley's deposition, although lodged with the Court, played no role in the trial. And in contrast with the Wray decision, it's important to recall that this was a bench trial. It's evidently the Lakeview decision was also based on a bench trial. No, it was, Lakeside was a jury trial. And after trial, after considering all the evidence, the trial judge made a finding that Dr. Jacobson had no bias. So even if he had some relationship with the IRB, because he had no bias, that would not have affected the outcome. And it's important to recall how serious these research violations were. Children were subjected to DEXA scans, which is a form of X-ray radiation, and they were subjected to blood tests. When asked at trial, Dr. Smith testified she did not know what, if any, injuries took place because of the distance and the difficulty in getting the information from Argentina. But we know the research protocols were violated. Children were tested when they were not able to. Well, this is all fine and true, but it was Dr. Balin who blew the whistle. On that violation, but he didn't blow the whistle on his failing to obtain IRB approval for changes in research protocol, his failure to notify the IRB of other protocol violations, or his failure to comply with IRB directives. That was adduced by the ORO in its interim and final reports. So he was not entirely forthcoming, although he is to be credited for reporting the underage subject. And it's also important to note that Dr. Balin and Dr. Limonade were treated the same. Both were suspended from research, but because Dr. Limonade had some ongoing clinical duties, he was able to be transferred into clinical duties after his suspension from research. Dr. Balin was unique at the VA because he had 100 percent research duties, although he had some clinical work at Loma Linda University. But there was no opening for him in the clinical area, so that had to take time to find an opening for him to work in clinical. And I see that my time is all but out. Unless you want to go on. No, it is out. You're going to be here. It's on the uptick. Thank you. Thank you very much. Ms. Flanders? This Court has been told that this report was made. This Court was told how serious these violations are. And if they were that serious, a report in May of 2002 sat idle until December of 2003, 18 months. And the only intervening event that got the ball rolling toward this investigation was the filing of this EEO report and the challenge to Dr. Jacobson's authority by Dr. Balin. What did Dr. Farley, is it Dr. Farley? Dr. Farley. Yeah, what did Dr. Farley's deposition reveal about why he sat so long on it? In all candor, I don't remember if he had an explanation. The report was made to the IRB. The IRB, any time from May of 2002 until finally Dr. Farley and the IRB looked at it, they could have started that investigation any time. Well, what evidence was put before the district court as to why that sat so long? There was no evidence offered to explain it other than the filing of the EEO charge. Okay. All right. On the issue of the administrative leave, Dr. Balin was placed unadministratively by Jacobson. And he, counsel mentioned that Dr. Libinanti was allowed to do clinical work. Dr. Balin was also approved for clinical duties. And given the time that we're in, it's obvious that if he was approved for clinical duties, he certainly could have done them if Jacobson had warned him to do them. He didn't. Judge Fletcher asked about basic and human subjects research. The Institutional Review Board, and the record is clear on this, only has authority over human subjects research, not basic. In other words, animal or molecular studies versus actually taking samples from humans. Ninety percent of what Dr. Balin did at that laboratory had to do with basic research. So that if, in fact, Jacobson was acting out of wholly legitimate motives and not discriminatory motives, he could have certainly made the decision to limit Dr. Balin's involvement in human subjects research until after the study had been completed and let him continue basic research. The Argentina study, the problems with it that were later identified had to do with human subjects research, not basic research. The lower court didn't find that there was this pretext or animosity. Given that evidence and applying the proper standard, the Burlington standard, and not the normal discrimination standard, it's apparent that that defining was erroneous as a matter of law. Counsel, was it this board that made the decision that he could not do any research, or was it Jacobson? That was Jacobson. The IRB only can limit him from doing human subjects research. They cannot. They have no control over basic research. That was Jacobson acting alone. What the court, in these cases that we mentioned earlier, and there's a- Counsel, you're over time. I'm sorry. Yeah. I think we have the argument in the briefs, and I think we now have a good understanding of the case. Thank you. Thank you both. The case is submitted, and we'll stand in brief recess for about ten minutes. All rise.
judges: Fletcher B. , Fisher, Gould